Barry I. Levy, Esq.
Michael Vanunu, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                            Docket No.: _____(       )

                                    Plaintiffs,

                                                                          **Plaintiffs Demand a**
                    -against-                                              **Trial by Jury**

YUNGI MED SUPPLY CORP., SHEMESH MED PRO
CORP., SIMCHA MED SUPPLY CORP., OLYAM MEDIC
SUPPLY CORP., SANSARA MED PRODUCTS CORP.,
DOLEO MED PRODUCTS CORP., LOLLITA
DASHEVSKY, SVETLANA DRUBETSKAYA,
ALEKSANDRE JAKOBIA, ALEXANDER SOLOVYOV,
INGA MELNICHUK, NATALIA CATARASO, and
JOHN DOE DEFENDANTS "1" – "10",

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Yungi Med Supply Corp., Shemesh

Med Pro Corp., Simcha Med Supply Corp., Olyam Medic Supply Corp., Sansara Med Products

Corp., Doleo Med Products Corp., Lollita Dashevsky, Svetlana Drubetskaya, Aleksandre Jakobia, Alexander Solovyov, Inga Melnichuk, Natalia Cataraso, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $2.2 million that Defendants have wrongfully obtained from GEICO by submitting and causing hundreds of fraudulent no-fault insurance charges to be submitted relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic car seats, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through a series of companies known as Yungi Med Supply Corp. ("Yungi Supply"), Shemesh Med Pro Corp. ("Shemesh"), Simcha Med Supply Corp. ("Simcha Supply"), Olyam Medic Supply Corp. ("Olyam Supply"), Sansara Med Products Corp. ("Sansara"), and Doleo Med Products Corp. ("Doleo") (collectively, the "DME Entities").

2.      The DME Entities are all New York corporations that have in a consecutive manner dispensed DME to persons who were allegedly involved and injured in automobile accidents and were entitled for coverage under no-fault insurance policies issued by GEICO ("Insureds") as part of a common "quick hit" scheme to submit a large volume of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3.      While these companies are owned on paper by Lollita Dashevsky ("Dashevsky"), Svetlana Drubetskaya ("Drubetskaya"), Aleksandre Jakobia ("Jakobia"), Alexander Solovyov ("Solovyov"), Inga Melnichuk ("Melnichuk") and Natalia Cataraso ("Cataraso") (collectively, the "Paper Owner Defendants"), at all times they were actually operated and controlled by others not

presently identifiable to GEICO.

4.     The scheme used unlawful kickbacks and other financial incentives to collude with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics") and various physicians and other healthcare providers (the "Referring Providers") who prescribed Fraudulent Equipment on a systematic basis and without medical necessity to the Insureds treating at the Clinics, which were then routed directly to the DME Entities.  Once the prescriptions for Fraudulent Equipment were secured, Defendants then billed GEICO collectively more than $3.6 million, with each DME Entity making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to GEICO and maximize Defendants' ill-gotten gains.  As part of their scheme to extract money from GEICO and avoid detection, Defendants shifted the billing submitted to GEICO from one DME Entity to the next over the course of just eight (8) months between January and August 2024 and continue to seek collections on the fraudulent billing through today.

5.     GEICO seeks to terminate this fraudulent scheme and recover more than $2.2 million that has been wrongfully obtained by the DME Entities, the Paper Owner Defendants, John Doe Defendants since 2024 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $840,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the DME Entities since 2024 because:

> (i)     The Defendants billed GEICO for Fraudulent Equipment when they were not entitled to collect No-Fault Benefits because they failed to comply with local licensing requirements;
>
> (ii)    The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;
>
> (iii)   The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent provided – pursuant to

prescriptions purportedly issued by the Referring Providers as a result of predetermined fraudulent protocols, which were solely to financially enrich Defendants and others not presently known rather than to treat the Insureds;

(iv)    The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

6.    The Defendants fall into the following categories:

(i)    The DME Entities are New York corporations that purport to purchase DME and OD from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)    Defendant Dashevsky is listed on paper as the owner, operator, and controller of Yungi Supply, when, as discussed below, Dashevsky works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Yungi Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)    Defendant Drubetskaya is listed on paper as the owner, operator, and controller of Shemesh, when, as discussed below, Drubetskaya works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Shemesh to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv)    Defendant Jakobia is listed on paper as the owner, operator, and controller of Simcha Supply, when, as discussed below, Jakobia works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Simcha Supply to submit bills to GEICO and other New

York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v)     Defendant Solovyov is listed on paper as the owner, operator, and controller of Olyam Supply, when, as discussed below, Solovyov works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Olyam Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vi)    Defendant Melnichuk is listed on paper as the owner, operator, and controller of Sansara, when, as discussed below, Melnichuk works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Sansara to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vii)   Defendant Cataraso is listed on paper as the owner, operator, and controller of Doleo, when, as discussed below, Cataraso works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Doleo to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(viii)  John Doe Defendants "1" – "10" ("John Doe Defendants") are presently not identifiable but are: (i) secretly controlling and profiting from the DME Entities; (ii) associated with the Clinic Controllers and Referring Providers at the Clinics which are the sources of prescriptions to the DME Entities; and/or (iii) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

7.      As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented the ownership and business premises address for each of the DME Entities;

(ii)    The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – based upon phony prescriptions, including photocopied prescriptions, received as a result of unlawful financial arrangements between Defendants and others who are not presently

5

identifiable and, thus, not entitled for no-fault insurance reimbursement in the first instance;

(iii)   The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent provided – pursuant to predetermined fraudulent protocols designed by Defendants and others not presently identifiable to GEICO, which was solely to financially enrich Defendants and others not presently known, rather than to treat or otherwise benefit the Insureds;

(iv)   The Fraudulent Equipment was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(v)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to GEICO – and other New York automobile insurers – fraudulently and intentionally mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(vi)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to GEICO – and other New York automobile insurers – fraudulently and intentionally grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

8.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Entities.

9.      The chart attached hereto as Exhibits "1" through "6" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo.

10.     Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has continued uninterrupted through the present day, as Defendants continue to seek collection on pending charges for the Fraudulent Equipment.

11.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of

more than $2.2 million.

## THE PARTIES

### I.   Plaintiffs

12.   Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.   Defendants

13.   Defendant Dashevsky resides in and is a citizen of New York and is listed as the paper owner of Yungi Supply.   Dashevsky lives with Jakobia, the "paper" owner of Simcha Supply.

14.   Defendant Yungi Supply is a New York corporation that was incorporated on or about December 18, 2023, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Dashevsky.   In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Yungi Supply and, with the aid of Dashevsky, used Yungi Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.   Dashevsky is known to GEICO, having worked as a receptionist at the Clinic that is located at 160-59 Rockaway Blvd., Jamaica, New York, which was a primary source of prescriptions for Fraudulent Equipment that were provided to the DME Entities.

16.   Defendant Drubetskaya resides in and is a citizen of New York and is listed as the paper owner of Shemesh.

17.     Defendant Shemesh is a New York corporation that was incorporated on or about February 2, 2024, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Drubetskaya.  In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Shemesh and, with the aid of Drubetskaya, used Shemesh as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant Jakobia resides in and is a citizen of New York and is listed as the "paper" owner of Simcha Supply.  Jakobia lives with Dashevsky, the "paper" owner of Yungi Supply.

19.     Defendant Simcha Supply is a New York corporation that was incorporated on or about March 8, 2024, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Jakobia.  In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Simcha Supply and, with the aid of Jakobia, used Simcha Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.     Defendant Solovyov resides in and is a citizen of New York and is listed as the "paper" owner of Olyam Supply.

21.     Defendant Olyam Supply is a New York corporation that was incorporated on or about March 28, 2024, has its principal place of business in Nassau County, New York, and is owned on paper and purportedly operated and controlled by Solovyov.  In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Olyam Supply and, with the aid of Solovyov, used Olyam Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

22.     Defendant Melnichuk resides in and is a citizen of New York and is listed as the "paper" owner of Sansara.

23.     Defendant Sansara is a New York corporation that was incorporated on or about May 9, 2024, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Melnichuk.  In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Sansara and, with the aid of Melnichuk, used Sansara as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

24.     Defendant Cataraso resides in and is a citizen of New York and is listed as the "paper" owner of Doleo.

25.     Defendant Doleo is a New York corporation that was incorporated on or about June 21, 2024, has its principal place of business in Queens County, New York, and is owned on paper and purportedly operated and controlled by Cataraso.  In actuality, one of the John Doe Defendants secretly operates, manages, controls and profits from Soleo and, with the aid of Cataraso, used Doleo as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

26.     The John Doe Defendants include the individuals who are (i) secretly operating, managing, controlling, and profiting from the DME Entities, (ii) the individuals associated with the Clinic Controllers and who are not licensed healthcare professionals but who unlawfully own and control the Clinics, and (iii) have conspired with the Paper Owner Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interest and costs, and is between citizens of different states.

28.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

30.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

31.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

32.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

33.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

34.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

35.     Pursuant to the No-Fault Laws, healthcare service providers are not entitled to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

36.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

37.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

38.     Prohibited kickbacks include more than payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

39.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound

by ethical rules that govern the quality of care delivered by a physician to a patient."

40.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

41.    Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs, ("DCWP") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

42.    It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

43.    A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

44.    The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for

false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

45. New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

46. Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

47. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

48. In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

49. Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

50.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider, subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

51.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

52.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), and whirlpool baths.

53.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

54.     To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not

artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

55.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

56.     As it relates to DME and OD, the New York State Workers' Compensation Board adopted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule") that became effective on April 4, 2022.

57.     Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain specifically-listed pieces of DME ("Fee Schedule item").  The charges for the reimbursement of DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

58.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

59.     For Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable

considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.  See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

60.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items.  The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

61.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement."  See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

62.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized.  Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.  As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

63.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among

other things – that:

> (i)     The provider is in compliance with all significant statutory and regulatory requirements;
>
> (i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;
>
> (ii)    The prescription for DME or OD is not based on any unlawful financial arrangement;
>
> (iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;
>
> (iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and
>
> (v)     The fee sought for the DME or OD provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    The DME Entities' Common Secret Ownership

64.     The John Doe Defendants conspired with the Paper Owner Defendants to design and implement a complex fraudulent scheme in which the DME Entities were used consecutively and in conjunction with each other over the course of eight (8) months to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

65.     While each of the DME Entities were formed and listed as being owned by one of the Paper Owner Defendants, all of the DME Entities were actually controlled by John Doe Defendant 1, who is not presently identifiable to GEICO (hereinafter, the "Secret Owner"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

66.    The Secret Owner was able to secretly control and profit from the DME Entities by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents needed to be filed with the State of New York and City of New York to lawfully operate the DME Entities.

67.    In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Entities, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Entities that could only exist through the Secret Owner's involvement.

68.    The Secret Owner, together with the Paper Owner Defendants, operated the DME Entities in the following sequential fashion as part of a "quick hit" strategy to limit the amount of billing submitted from any one of the DME Entities and mask the common fraudulent scheme:

   (i)    Yungi Supply billed GEICO for dates of service between January 15, 2024 and February 28, 2024;

   (ii)   Shemesh billed GEICO for dates of service between February 14, 2024 and March 20, 2024;

   (iii)  Simcha Supply billed GEICO for dates of service between March 14, 2024 and April 18, 2024;

   (iv)   Olyam Supply billed GEICO for dates of service between April 15, 2024 and May 20, 2024;

   (v)    Sansara billed GEICO for dates of service between May 13, 2024 and July 15, 2024; and

   (vi)   Doleo billed GEICO for dates of service between July 1, 2024 and August 2, 2024.

69.    Similarly, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently identifiable but who are affiliated with the Clinics, the DME Entities would receive virtually

identical prescriptions for Fraudulent Equipment from multiple Clinics in the New York metropolitan area, including: (i) 1251 Ralph Ave., Brooklyn, New York; (ii) 3209 Fulton St., Brooklyn, New York; (iii) 6937 Myrtle Ave., Brooklyn, New York; and (iv) 1955 Southern Blvd., Bronx, New York.

70.     Additionally, and as discussed further below, the DME Entities each billed GEICO using virtually identical HCPCS Codes in response to the virtually identical prescriptions for Fraudulent Equipment they received, and the DME Entities each made virtually identical coding misrepresentations and reimbursement misrepresentations in their billing to GEICO.

71.     Further, and as discussed in more detail below, each of the DME Entities misrepresented the addresses of where their businesses actually operated from.

### B.    Overview of the Common Fraudulent Scheme

72.     The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Entities as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which Defendants were never entitled to receive.

73.     To maximize the amount of no-fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Entities in sequential fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

74.     In keeping with the fact that that Defendants split up their billing in order maximize the amount of no-fault benefits they could collect, the DME Entities operated in sequential order, typically with some overlap to allow more than one entity to bill no-fault insurance carriers, including GEICO, at a single time.

75.    Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Entities to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

(i)    Between January and February 2024, Yungi Supply submitted more than $699,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $275,000.00, and there is more than $275,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(ii)    Between February and March 2024, Shemesh submitted more than $609,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $208,000.00, and there is more than $200,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iii)    Between March and April 2024, Simcha Supply submitted more than $485,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $388,000.00, and there is more than $38,000 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iv)    Between April and May 2024, Olyam Supply submitted more than $623,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $498,000.00, and there is more than $70,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(v)    Between May and July 2024, Sansara submitted more than $729,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $500,000.00, and there is more than $189,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

(vi)    Between July and August 2024, Doleo submitted more than $496,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $396,000.00, and there is more than $57,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

76.    The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the

Referring Providers because of improper agreements with the Clinic Controllers.

77.    As part of this scheme, Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

78.    None of Defendants marketed or advertised the DME Entities to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

79.    Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

80.    Instead, Defendants entered into illegal, collusive agreements with the Clinics, Clinic Controllers, and Referring Providers and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Entities for the specifically targeted Fraudulent Equipment.

81.    The prescriptions obtained by the DME Entities for Fraudulent Equipment were never given to the Insureds to fill, but as part of the scheme, they were routed directly to the DME Entities by the Clinic Controllers to ensure that the Insureds did not fill the prescriptions with legitimate DME and OD retailers.

82.    The prescriptions obtained by the DME Entities for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which Defendants used to (i) misrepresent the nature and quality of the items intended by the prescriptions; (ii) misrepresent the

nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO; and (iii) misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

83.     As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should often be written in a generic, vague, non-descript manner so that the DME Entities could have the flexibility to designate the products that would result in the highest forms of reimbursement from GEICO.

84.     The Defendants then used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds.  As a result, in virtually every circumstance available, the DME Entities purported to provide the Insureds with a variation that had high – if not one of the highest – maximum reimbursement rates under the applicable fee schedule.

85.     In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, each of Defendants engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

86.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Entities indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

87.     However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills

submitted by the DME Entities.

88.     Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Entities.

89.     The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by Defendants.

90.     In furtherance of their scheme to defraud GEICO and other automobile insurers, Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public for the same item.

91.     In actuality, the bills from Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public.

92.     As a further part of this scheme, Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided was cheap and poor-quality, and was purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

93.     In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily

obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by Defendants.

94.     The Defendants, by purchasing inexpensive and poor-quality Fraudulent Equipment, which they used to fill the generic and vague prescriptions provided by the Clinic Controllers and Referring Providers, executed a scheme to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

95.     Each of the DME Entities made virtually identical fraudulent misrepresentations in the HCPCS Codes used and the reimbursement rates charged to GEICO that would have been impossible but for their participation in a common scheme and control by the Secret Owner, to be described in more detail below.

96.     Further, in an effort to hide the extent of their fraudulent acts against GEICO, Defendants each also submitted multiple bills to GEICO for Fraudulent Equipment that was purportedly provided to Insureds on the same date.

97.     The Defendants submission of multiple bills to GEICO in this manner was in reality designed to further mask the fraudulent scheme and an effort to keep the individual totals on each bill artificially lower and avoid detection by GEICO.

### C.    The Defendants' Failure to Comply with Local Licensing Provisions

98.     As stated above, for a DME/OD supplier to provide DME or OD to automobile

accident victims within the City of New York, the DME/OD supplier must obtain a Dealer in Products License by the DCWP.

99.    For Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "6", the DME Entities were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "6" were located within the City of New York.

100.    As part of Defendants' scheme to defraud GEICO and other Insurers, Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the DME Entities appear to be legitimate suppliers of DME/OD.

101.    However, each of the DME Entities were not entitled to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds as they obtained Dealer in Products licenses through fraud and/or misrepresentations.

102.    As part of obtaining a Dealer in Products License, each of the Paper Owner Defendants completed a license application on behalf of their respective DME Entity that required them to identify – among other things – all owners of the DME Entity and the commercial address of where the DME Entity physically operated from.

103.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

104.    However, and in support of the fact that Defendants' scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, the Paper Owner Defendants each knowingly provided false information in their Dealer in Products License applications filed on behalf of the DME Entities.

105.    In each of the applications for a Dealer in Products license completed by the Paper Owner Defendants on behalf of the DME Entities, the Paper Owner Defendants falsely affirmed that the DME Entities operated or conducted business from the address listed in the respective applications.

106.    In support of the fact that the Dealer in Products license applications contained false affirmations, GEICO investigators attempted to verify each of the premises addresses listed in the DME Entities' applications for a Dealer in Products License and was unable to confirm the operation of any of the DME Entities at their stated addresses, nor were any of these locations open to the public.  For example:

(i)     GEICO investigators attempted to verify the address Dashevsky listed for Yungi Supply at 7405 18th Ave., Room 2, Brooklyn, New York, and observed a closed real estate office with no signage to identify Yungi Supply, including on the mailbox;

(ii)    GEICO investigators attempted to verify the address Drubetskaya listed for Shemesh at 2131 Ocean Ave., Suite 2C, Brooklyn, New York, and observed an apartment building with a dental office, and no signage for Shemesh anywhere on the building, including on the mailbox labeled "2C";

(iii)   GEICO investigators attempted to verify the address Jakobia listed for Simcha Supply at 266 47th St., Unit 367, Brooklyn, New York and observed a 5-story office building with a locked front door that had a digital building directory to gain access to the building which did not include Simcha Supply in the directory, nor did it include "Unit 367";

(iv)    GEICO investigators attempted to verify the address Solovyov listed for Olyam Supply at 316 Great Neck Rd., 2nd Fl., Great Neck, New York and observed a law office where investigators spoke with the law firm's receptionist who stated Olyam Supply only stored equipment and received mail at this location and someone from Olyam Supply came to the location "as necessary";

(v)     GEICO investigators attempted to verify the address Melnichuk listed for Sansara at 2632 E. 21st St., Ste. 1, Brooklyn, New York and observed an apartment building with two storefronts containing a weight loss clinic and a realty office with no signage for Sansara; and

(vi)     GEICO investigators attempted to verify the address Cataraso listed for Doleo at 2612 Borough Pl., Ste 4A, Brooklyn, New York and observed a 2-story building with a locked front door, and upon gaining entry to the building did not observe any signage for Doleo on the mailboxes or on Suite 4A, the office suite door was locked, and there was no answer after GEICO's investigator's knocked to gain entry.

107.     In further support of the fact that the DME Entities were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses, each of the Paper Owner Defendants affirmed on their license applications, under penalty for false statements, that they were the sole owner of each respective DME Entity.

108.     In reality, as set forth above, the DME Entities were actually controlled by the Secret Owner, who directly profited from the fraudulent scheme committed through the DME Entity.

109.     The Paper Owner Defendants knowingly provided false information regarding their business addresses and ownership to induce the DCWP to issue licenses to them, which would give Defendants the appearance of legitimacy and provide them with the opportunity to submit fraudulent billing to GEICO and other Insurers through the DME Entities.

110.     Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

111.     In each of the claims identified in Exhibits "1" through "6", Defendants knowingly misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds, when Defendants were never entitled to collect No-Fault Benefits in the first instance, because the DME Entities did not lawfully obtain Dealer in Products Licenses, because they received their Dealer in Products licenses under the false pretenses described above.

**D.    The Defendants' Unlawful Financial Arrangements**

112.    To obtain access to Insureds as part of the fraudulent scheme and maximize the No-Fault Benefits Defendants could obtain from GEICO and other New York automobile insurers, Defendants entered into unlawful financial agreements with others who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to Defendants in exchange for financial consideration.

113.    Since the inception of Defendants' fraudulent scheme, Defendants engaged in unlawful financial arrangements with the Clinic Controllers to obtain prescriptions for Fraudulent Equipment. These schemes allowed Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

114.    As part of the unlawful financial arrangements, Defendants paid thousands of dollars in kickbacks to others, many of whom are not presently identifiable, in order to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

115.    Based on these unlawful financial arrangements with the Clinics, Defendants received prescriptions for medically unnecessary Fraudulent Equipment pursuant to predetermined prescription protocols, including prescriptions that (i) contained a photocopied signature of the Referring Provider; and/or (ii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

116.    The Fraudulent Equipment was then prescribed to Insureds pursuant to predetermined protocols established at each of the Clinics, all of which almost exclusively treated No-Fault patients.

117.    These Clinics included, but were not limited to: (i) 1251 Ralph Ave., Brooklyn,

New York; (ii) 146 Empire Blvd., Brooklyn, New York; (iii) 60 Belmont Ave., Brooklyn, New York; (iv) 160-59 Rockaway Blvd, Jamaica, New York; (v) 30-55 3rd Ave., Bronx, New York; (vi) 3209 Fulton St., Brooklyn, New York; (vii) 2558 Holland Ave., Bronx; and (viii) 106-02 Northern Blvd., Corona, New York.

118.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

119.    In fact, GEICO has received billing from many of the Clinics from an ever-changing number of healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name, beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

120.    For example, GEICO has received billing for purported healthcare services rendered at: (i) the Clinic located at the 60 Belmont Ave., Brooklyn, New York Clinic from a "revolving door" of over 100 different healthcare providers; (ii) the 146 Empire Blvd., Brooklyn, New York Clinic from a "revolving door" of over 75 different healthcare providers; and (iii) the 1251 Ralph Ave., Brooklyn, New York Clinic from a "revolving door" of approximately 42 different healthcare providers.

121.    The Clinic located at 1251 Ralph Ave., Brooklyn, New York (the "Ralph Ave. Clinic") was referenced in a complaint filed by GEICO which alleged the payment of kickbacks in exchange for medically unnecessary and photocopied referrals for diagnostic ultrasounds from

the Ralph Ave. Clinic and other Clinic locations. See, Govt. Emps. Ins. Co., et al. v. Diana Vavikova, D.C., et al., 1:23-cv-09031-AMD-VMS (E.D.N.Y. 2023).

122.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

123.    Pursuant to the unlawful financial arrangements, Defendants would pay kickbacks to the Clinic Controllers or, upon information and belief, to fictitious businesses associated with them, in order to obtain referrals for the Fraudulent Equipment to be provided to motor vehicle accident victims who treated at the Clinics.

124.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from Defendants.

125.    Specifically, when the DME Entities billed GEICO for purportedly providing Fraudulent Equipment to Insureds who purportedly treated at the Clinics, the Insureds were directed to support staff at the Clinics who would directly provide the Fraudulent Equipment to the Insureds, without any involvement or interaction with the DME Entities.

126.    As a result of the unlawful financial arrangements between Defendants and the Clinic Controllers, Defendants received prescriptions for Fraudulent Equipment from the Clinics on a continuous basis, with prescriptions routed from one DME Entity to the next from January through August 2024.

127.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant

to predetermined fraudulent treatment protocols – as explained below.

128.    But for the payment of kickbacks from Defendants, the Clinic Controllers, working with the Referring Providers, would not have had any reason to direct a substantial volume of these medically unnecessary prescriptions to the DME Entities.

129.    Upon information and belief, the payment of kickbacks by Defendants was made at or near the time the prescriptions were issued, but Defendants and the Clinic Controllers and/or the Referring Providers affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

130.    As a result of the unlawful financial arrangements, Defendants were able to secure prescriptions for Fraudulent Equipment to use as the basis to submit billing to GEICO and other New York automobile insurers.

131.    In keeping with the fact that the prescriptions for Fraudulent Equipment were routed to Defendants based upon unlawful financial arrangements – and not based upon medical necessity – each of the DME Entities were regularly provided with prescriptions from the Clinics that contained a photocopied or stamped signature and were not actually signed or authorized by the Referring Provider.

132.    Based upon the unlawful financial arrangements between Defendants and the Clinic Controllers, these photocopied or stamped prescriptions were generated in order to further increase the amount of fraudulent billing Defendants could submit to GEICO through the DME Entities.

133.    There is no legitimate reason for the Clincs to have generated the photocopied or signature-stamped prescriptions used by each of the DME Entities as the basis to submit billing for Fraudulent Equipment to GEICO, yet this occurred repeatedly in the bills submitted by Defendants to GEICO.

134.   For example:

Example 1: Judy Thomas, N.P. Photocopied Prescriptions

| **Example** | **Sample photocopied signatures** |
|---|---|
| LSO Trunk Support (Custom Fitted) Prescription to **Yungi Supply** For Insured JL | Physician Name JUDY THOMAS FNP-BC    Physician License # _____<br><br>Office Address 1251 RALPH AVE BROOKLYN NY 11236<br><br>Physician Signature _____    Date 1/11/24 |
| Cervical Traction Frame w/ Pump Prescription to **Shemesh** For Insured AM | Physician Name: JUDY THOMAS FNP-BC    Physician License #: _____<br><br>Office Address: 1251 RALPH AVE BROOKLYN NY 11236<br><br>Physician Signature: _____    Date: 2/1/24 |
| LSO Trunk Support (Custom Fitted) Prescription to **Simcha Supply** For Insured AJ | Physician Name: JUDY THOMAS FNP-BC    Physician License #: _____<br><br>Office Address: 1251 RALPH AVE BROOKLYN NY 11236<br><br>Physician Signature: _____    Date: 3/5/24 |

Example 2: Gaetan Jean Marie, N.P. Photocopied/Stamped Prescriptions

| **Example** | **Sample photocopied/stamped signatures** |
|---|---|
| Shoulder Support (Custom Fitted) Prescription to **Olyam Supply** For Insured TC |  |
| Shoulder Support (Custom Fitted) Prescription to **Olyam Supply** For Insured WB |  |
| LSO Trunk Support (Custom Fitted) Prescription to **Olyam Supply** For Insured KA |  |
| LSO Trunk Support (Custom Fitted) Prescription to **Olyam Supply** For Insured SRM |  |

Example 3: Olivia Grant, N.P. Photocopied Prescriptions

| Example | Sample photocopied signatures |
|---|---|
| Osteogenesis Bone Stimulator Prescription to **Doleo** For Insured SM |  |
| Osteogenesis Bone Stimulator Prescription to **Doleo** For Insured KM |  |

135.    These are only representative examples.

136.    The Defendants knew that these prescriptions from the Referring Providers were fraudulent and the result of their unlawful financial arrangements yet used these prescriptions as the basis to support the fraudulent charges identified in Exhibits "1" – "6" anyway, solely for their own financial enrichment.

137.    In all of the claims identified in Exhibits "1" through "6", Defendants knowingly misrepresented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were, therefore, entitled to collect No-Fault Benefits in the first instance, when the prescriptions were provided -- to the extent provided at all -- pursuant to unlawful financial arrangements

**E.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

138.    In addition to the unlawful financial arrangements between Defendants and the Clinic Controllers, the prescriptions that were provided to Defendants were the result of predetermined fraudulent protocols between and among Defendants, the Clinic Controllers and the Referring Providers.

139.    In the claims identified in Exhibits "1" through "6", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

140.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "6", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

141.    In keeping with the fact that the Insureds identified in Exhibits "1" through "6" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

142.    To the extent the Insureds in the claims identified in Exhibits "1" through "6" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

143.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers at the respective Clinics were subject to extremely similar treatment, including nearly identical prescriptions for Fraudulent Equipment.

144.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "6" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

145.    For example, virtually all of the Insureds were prescribed orthotic devices after their low-speed and low-impact motor vehicle accidents, when such orthotic devices are – in a legitimate setting – only provided after appropriate consideration for a specific, documented, and corelated condition to patients.

146.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

147.    In general, Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

    (i)    an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

    (ii)    the Insured would be seen by a Referring Provider;

    (iii)    on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

    (iv)    subsequently, to the extent the Insured returned to the Clinic for one or more additional evaluations and treatment, they would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

    (v)    at least one, if not more than one, prescription for DME and/or OD would be directly provided to Defendants to fill and was without any involvement by the Insured.

148.    Virtually all of the claims identified in Exhibits "1" through "6" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

149.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

150.    Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider <u>may</u> – but generally does not – prescribe DME and/or OD.

151.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

152.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

153.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

154.    If a healthcare provider determines that DME and/or OD is medically necessary

after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it would help the Insureds.

155.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

156.    It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" through "6" who treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

157.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "6" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

158.    Here, and in keeping with the fact that the prescriptions provided to Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "6" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

159.    While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all the Insureds identified in Exhibits "1" through "6" regardless which Clinic the insureds visited.

160.    In also in keeping with the fact that the prescriptions for Fraudulent Equipment used by Defendants were medically unnecessary and obtained as part of a predetermined fraudulent protocol, multiple prescriptions purportedly issued by the Referring Providers were issued on dates that the Referring Providers never even treated the Insureds.

161.    Also, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were issued pursuant to predetermined fraudulent protocols and not for the benefit of the Insureds, as set forth below, the Referring Providers issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

162.    The multiple checkmark-based prescriptions issued by the Referring Providers to an Insured on the same date was part of a predetermined fraudulent protocol that was designed to allow Defendants to submit multiple bills to GEICO for Fraudulent Equipment in an effort to artificially lower the total dollar amount submitted on each bill and avoid detection.

163.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to Defendants and used by Defendants to bill GEICO for

the charges identified in Exhibits "1" through "6".

164.    Also in keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "6" were not medically necessity but were the result of a predetermined fraudulent protocol, the prescriptions often contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

165.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibits "1" through "6" were not based upon prescriptions for medically necessary Fraudulent Equipment, because Defendants purportedly provided Insureds with whatever DME or OD they wanted, as the Fraudulent Equipment purportedly provided by each of Defendants – and billed to GEICO – was often not the item identified in the prescriptions purportedly issued by the Referring Providers.

166.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "6", Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to Defendants pursuant agreements with others who are not presently identifiable.

### 1.    The Predetermined Fraudulent Protocol at the Ralph Ave. Clinic

167.    The Ralph Ave. Clinic was one of the Clinics where Defendants conspired with others not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent

Equipment pursuant to a predetermined fraudulent protocol and serves to demonstrate the scope of Defendants' fraudulent scheme as it shifted operations from one DME Entity to the next.

168.    After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibits "1" – "6" who purportedly received treatment at the Ralph Ave. Clinic were purportedly provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

169.    The Referring Providers who purportedly conducted an initial evaluation on the Insureds at the Ralph Ave. Clinic did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

170.    Rather, the Referring Providers at the Ralph Ave. Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol established by the Clinic Controllers.

171.    Further, virtually every Insured who underwent an initial examination at the Ralph Ave. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

172.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "1" treating at the Ralph Ave. Clinic: (i) "Car Seat"; (ii) "Cervical Collar"; (iii) "Cervical Pillow"; (iv) "Egg Crate Mattress"; (v) "Bed Board"; (vi) "General Use Cushion"; (vii) "Lumbar Cushion"; (viii) "Lumbar Sacral Support"; (ix) "Positioning Cushion"; and (x) "Thermophore".

173.    To the extent that the Insureds identified in Exhibits "1" – "6" returned to the Ralph Ave. Clinic, they would virtually always be provided with additional prescriptions for an additional set of Fraudulent Equipment purportedly issued by the Referring Providers. These would include: (i) "EMS Unit"; (ii) "Infa Red (sp) Lamp"; and (iii) "Personal Massager".

174.    In addition, the Referring Providers would also routinely issue one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO W/APL Control Custom"; (ii) "Cervical Traction Frame w/ Pump"; (iii) Shoulder Support (Custom Fitted); (v) LSO Trunk Support (Custom Fitted).

175.    Further, Insureds would also virtually always be provided with a prescription for a "Non-Spine Osteogenesis Stimulator", which is a device used to help heal bone fractures and stimulate bone growth in certain circumstances, none of which were present in the Insureds identified in Exhibits "1" – "6".

176.    Additionally, certain Insureds identified in Exhibits "1" – "6" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by the same Referring Provider.

177.    Multiple separate prescriptions were issued to the Insureds on a single date, and purportedly by the same Referring Provider, as part of the scheme between Defendants and the Clinic Controllers to provide Defendants with the ability to submit separate bills to GEICO for reimbursement of No-Fault Benefits in a way to lower the amount charged to GEICO on each bill so Defendants could avoid detection of their fraudulent schemes.

178.    Further, as part of the scheme between Defendants and the Clinic Controllers, multiple Insureds received prescriptions that were never actually authored by the Referring Provider but instead utilized a photocopied signature of the Referring Provider who purportedly

issued the prescription.

179.    In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers were pursuant to a predetermined fraudulent protocol, the vast majority of Insureds who treated at the Ralph Ave. Clinic were issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insured was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

180.    For example:

(i)    On November 30, 2023, an Insured named SLJ was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Judy Thomas, N.P. ("Thomas") on December 7 2023, Thomas purportedly issued three separate prescriptions in the name of SLJ for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Knee support (right & left)<br>Shoulder support (right) | Non-Defendant DME supplier |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On January 9, 2024, Thomas purportedly issued a prescription in the name of SLJ, despite not examining or otherwise treating SLJ on that date, for:

|   | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|

| 1 | Cervical traction frame w/ pump | Non-Defendant DME supplier |
|---|---|---|

On January 11, 2024, Thomas purportedly issued two separate prescriptions in the name of SLJ, despite not examining or otherwise treating SLJ on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO trunk support (custom fitted) | **Yungi Supply** |
| 2 | Shoulder support (custom fitted) – right | **Yungi Supply** |

On January 17, 2024, after a purported follow-up examination with Kimberly Johnson, N.P. ("Johnson"), Johnson purportedly issued three separate prescriptions in the name of SLJ for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Yungi Supply** |
| 2 | Water Circ Heat w/ Pump | **Yungi Supply** |
| 3 | Osteogenesis bone stimulator | **Yungi Supply** |

On January 18, 2024, Thomas purportedly issued a prescription in the name of SLJ, despite not examining or otherwise treating SLJ on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee support (custom fitted) – left | **Yungi Supply** |

(ii)    On December 18, 2023, an Insured named BR was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on December 19, 2023, Thomas purportedly issued a prescription in the name of BR for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support | Non-Defendant DME supplier |

| | Positioning cushion<br>Thermophore<br>Car seat | |
|---|---|---|

On January 23, 2023, after a purported follow-up examination with Thomas, Thomas purportedly issued three separate prescriptions in the name of BR for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Yungi Supply** |
| 2 | Water Circ Heat w/ Pump | **Yungi Supply** |
| 3 | Osteogenesis bone stimulator | **Yungi Supply** |

On August 29, 2023, Thomas purportedly issued two prescriptions in the name of BR, despite not examining or otherwise treating BR on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO trunk support (custom fitted) | **Shemesh** |
| 2 | Cervical traction frame w/ pump | **Shemesh** |

(iii)  On December 14, 2023, an Insured named LE was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Sherly Varghese, N.P. ("Varghese") on December 20, 2023, Varghese purportedly a prescription in the name of LE for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support - Left | Non-Defendant DME supplier |

On January 18, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued four separate prescriptions in the name of LE for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Yungi Supply** |
| 2 | Water Circ Heat w/ Pump | **Yungi Supply** |
| 3 | Osteogenesis Bone Stimulator | **Yungi Supply** |
| 4 | Shoulder support (custom fitted) - Left | **Yungi Supply** |

(iv)   On December 29, 2023, an Insured named AJ was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January 2, 2024, Thomas purportedly issued a prescription in the name of AJ for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – right & left | Non-Defendant DME supplier |

On February 14, 2024, after a purported follow-up examination with Varghese, Varghese purportedly issued three separate prescriptions in the name of AJ for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Shemesh** |
| 2 | Water Circ Heat w/ Pump | **Shemesh** |
| 3 | Osteogenesis Bone Stimulator | **Shemesh** |

On February 22, 2024, Thomas purportedly issued a prescription in the name of AJ, despite not examining or otherwise treating AJ on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Support (custom fitted) - right | **Shemesh** |

On March 5, 2024, Thomas purportedly issued two prescriptions in the name of AJ, despite not examining or otherwise treating AJ on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (custom fitted) | **Simcha Supply** |
| 2 | Cervical traction frame w/ pump | **Simcha Supply** |

(v)     On January 5, 2024, an Insured named AM was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January 9, 2024, Thomas purportedly issued a prescription in the name of AM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – left<br>Knee support - left | Non-Defendant DME supplier |

On February 1, 2024, Thomas purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical traction frame w/ pump | **Shemesh** |

On February 8, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued three separate prescriptions in the name of AM for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Shemesh** |
| 2 | Water Circ Heat w/ Pump | **Shemesh** |
| 3 | Osteogenesis Bone Stimulator | **Shemesh** |

On February 13, 2024, Thomas purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Knee support (custom fitted) – left | **Shemesh** |

On February 27, 2024, Thomas purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (custom fitted) | **Simcha Supply** |

On February 28, 2024, Thomas purportedly issued a prescription in the name of AM, despite not examining or otherwise treating AM on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Support (custom fitted) – left | **Simcha Supply** |

(vi)   On January 10, 2024, an Insured named TB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January 23, 2024, Thomas purportedly issued a prescription in the name of TB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar | **Yungi Supply** |

| | |
|---|---|
| Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – left<br>Knee support - left | |

On February 29, 2024, Thomas purportedly issued two prescriptions in the name of TB, despite not examining or otherwise treating TB on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee support (custom fitted) - left | **Simcha Supply** |
| 2 | Shoulder support (custom fitted) - left | **Simcha Supply** |

On March 6, 2024, after a purported follow-up examination with Varghese, Varghese purportedly issued three separate prescriptions in the name of TB for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Simcha Supply** |
| 2 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 3 | Osteogenesis Bone Stimulator | **Simcha Supply** |

On March 14, 2024, Thomas purportedly issued a prescription in the name of TB, despite not examining or otherwise treating TB on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Simcha Supply** |
| 2 | Cervical Traction Frame w/ Pump | **Simcha Supply** |

(vii)    On January 11, 2024, an Insured named KF was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January

23, 2024, Thomas purportedly issued three separate prescriptions in the name of KF for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat | **Yungi Supply** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On February 27, 2024, Thomas purportedly issued two separate prescriptions in the name of KF, despite not examining or otherwise treating KF on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Simcha Supply** |
| 2 | Cervical Traction Frame w/ Pump | **Simcha Supply** |

On February 29, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued three separate prescriptions in the name of KF for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Simcha Supply** |
| 2 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 3 | Osteogenesis Bone Stimulator | **Simcha Supply** |

(viii)  On January 20, 2024, an Insured named WS was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January

23, 2024, Thomas purportedly issued two separate prescriptions in the name of WS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – right & left | **Yungi Supply** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |

On February 20, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued three separate prescriptions in the name of WS for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Shemesh** |
| 2 | Water Circ Heat w/ Pump | **Shemesh** |
| 3 | Osteogenesis Bone Stimulator | **Shemesh** |

On February 29, 2024, Thomas purportedly issued two separate prescriptions in the name of WS, despite not examining or otherwise treating WS on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Shemesh** |
| 2 | Cervical Traction Frame w/ Pump | **Shemesh** |

(ix)    On January 22, 2024, an Insured named RW was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on January

30, 2024, Thomas purportedly issued three separate prescriptions in the name of RW for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – right & left<br>Knee support - left | **Yungi Supply** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On February 20, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued three separate prescriptions in the name of RW for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Ankle support – right<br>Kne support - right | **Shemesh** |
| 2 | Shoulder support (Custom Fitted) - left | **Shemesh** |
| 3 | Shoulder support (Custom Fitted) - right | **Shemesh** |

On March 14, 2024, Paul Sylvain, N.P. ("Sylvain") purportedly issued two separate prescriptions in the name of RW, despite not examining or otherwise treating RW on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Simcha Supply** |
| 2 | Cervical Traction Frame w/ Pump | **Simcha Supply** |

On March 19, 2024, after a purported follow-up examination with Sylvain, Sylvain purportedly issued three separate prescriptions in the name of RW for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Simcha Supply** |
| 2 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 3 | Osteogenesis Bone Stimulator | **Simcha Supply** |

On March 28, 2024, Sylvain purportedly issued a prescription in the name of RW, despite not examining or otherwise treating RW on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee support (Custom Fitted) – left | **Olyam Supply** |

(x)     On February 1, 2024, an Insured named KP was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on February 6, 2024, Thomas purportedly issued three separate prescriptions in the name of KP for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Elbow support - left | **Shemesh** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On March 6, 2024, after a purported follow-up examination with Varghese, Varghese purportedly issued three separate prescriptions in the name of KP for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Simcha Supply** |
| 2 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 3 | Osteogenesis Bone Stimulator | **Simcha Supply** |

(xi)    On February 1, 2024, an Insured named GP was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on February 15, 2024, Thomas purportedly issued three separate prescriptions in the name of GP for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support - right | **Shemesh** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On February 29, 2024, after a purported follow-up examination with Thomas, Thomas purportedly issued a prescription in the name of GP for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Lumbar cushion<br>Lumbar sacral support | **Shemesh** |

On March 7, 2024, Thomas purportedly issued a prescription in the name of GP, despite not examining or otherwise treating GP on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction Frame w/ Pump | **Simcha Supply** |

On March 21, 2024, after a purported follow-up examination with Sylvain, Sylvain purportedly issued two separate prescriptions in the name of GP for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 2 | Osteogenesis Bone Stimulator | **Simcha Supply** |

On March 15, 2024, Jean Fleurgin, N.P. ("Fleurgin") purportedly issued a prescription in the name of GP, despite not examining or otherwise treating GP on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Sansara** |

(xii)  On February 24, 2024, an Insured named KA was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic. After an initial examination with Thomas on February 27, 2024, Thomas purportedly issued three separate prescriptions in the name of KA for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat | **Shemesh** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On April 9, 2024, after a purported follow-up examination with Sylvain, Sylvain purportedly issued three separate prescriptions in the name of KA for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Olyam Supply** |
| 2 | Water Circ Heat w/ Pump | **Olyam Supply** |
| 3 | Osteogenesis Bone Stimulator | **Olyam Supply** |

On April 15, 2024, Gaetan Jean Marie, N.P. ("Jean Marie") purportedly issued a prescription in the name of KA, despite not examining or otherwise treating KA on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Olyam Supply** |

On May 15, 2024, Fleurgin purportedly issued a prescription in the name of KA, despite not examining or otherwise treating KA on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical Traction Frame w/ Pump | **Sansara** |

(xiii)  On February 26, 2024, an Insured named RH was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Thomas on February 27, 2024, Thomas purportedly issued three separate prescriptions in the name of RH for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat | **Shemesh** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On March 28, 2024, after a purported follow-up examination with Sylvain, Sylvain purportedly issued three separate prescriptions in the name of RH for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Simcha Supply** |
| 2 | Water Circ Heat w/ Pump | **Simcha Supply** |
| 3 | Osteogenesis Bone Stimulator | **Simcha Supply** |

On April 15, 2024, after a purported follow-up examination with Katherine Entress, N.P. ("Entress"), Entress purportedly issued a prescription in the name of RH for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Sansara** |

(xiv)  On March 8, 2024, an Insured named WB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Sylvain on March 14, 2024, Sylvain purportedly issued three separate prescriptions in the name of WB for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – left<br>Elbow support – right & left | **Simcha Supply** |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On March 26, 2024, after a purported follow-up examination with Olivia Grant, N.P. ("Grant"), Grant purportedly issued a prescription in the name of WB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder support - right | **Simcha Supply** |

On April 4, 2024, Jean Marie purportedly issued a prescription in the name of WB, despite not examining or otherwise treating WB on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Shoulder Support (Custom Fitted) - left | **Olyam Supply** |

On April 23, 2024, after a purported follow-up examination with Entress, Entress purportedly issued four separate prescriptions in the name of WB for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Olyam Supply** |
| 2 | Water Circ Heat w/ Pump | **Olyam Supply** |
| 3 | Osteogenesis Bone Stimulator | **Olyam Supply** |
| 4 | Shoulder Support (Custom Fitted) – right | **Sansara** |

On May 2, 2024, Entress purportedly issued a prescription in the name of WB, despite not examining or otherwise treating WB on that date, for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | **Sansara** |

(xv)  On March 15, 2024, an Insured named VC was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Sylvain on March 19, 2024, Sylvain purportedly issued three separate prescriptions in the name of VC for:

| | Item(s) Prescribed | Prescription Provided to: |
|---|---|---|
| 1 | Cervical collar | **Simcha Supply** |

| | | |
|---|---|---|
| | Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat<br>Shoulder support – left | |
| 2 | Triad 3LT infrared heat pad with low level light therapy | Non-Defendant DME supplier |
| 3 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On April 4, 2024, Jean Marie purportedly issued a prescription in the name of VC, despite not examining or otherwise treating VC on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder Support (Custom Fitted) - left | **Olyam Supply** |

On April 23, 2024, after a purported follow-up examination with Entress, Entress purportedly issued three separate prescriptions in the name of VC for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Olyam Supply** |
| 2 | Water Circ Heat w/ Pump | **Olyam Supply** |
| 3 | Osteogenesis Bone Stimulator | **Olyam Supply** |

(xvi)    On March 12, 2024, an Insured named SW was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Sylvain on April 9, 2024, Sylvain purportedly issued two prescriptions in the name of SW for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board | **Olyam Supply** |

|   |   |   |
|---|---|---|
|   | General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Shoulder support – right & left<br>Knee support – left<br>Elbow support – left<br>Wrist support - left |   |
| 2 | Transcutaneous electrical joint stimulation device | Non-Defendant DME supplier |

On May 9, 2024, after a purported follow-up examination with Entress, Entress purportedly issued three separate prescriptions in the name of SW for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Sansara** |
| 2 | Water Circ Heat w/ Pump | **Sansara** |
| 3 | Osteogenesis Bone Stimulator | **Sansara** |

On May 23, 2024, Entress purportedly issued a prescription in the name of SW, despite not examining or otherwise treating SW on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder support (Custom Fitted) – left | **Sansara** |

(xvii)   On April 9, 2024, an Insured named CS was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Sylvain on April 16, 2024, Sylvain purportedly issued a prescription in the name of CS for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support | **Olyam Supply** |

|  | Positioning cushion<br>Thermophore<br>Shoulder support – right & left<br>Knee support - left |  |
|---|---|---|

On May 15, 2024, after a purported follow-up examination with Fleugrin, Fleugrin purportedly issued three separate prescriptions in the name of CS for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Sansara** |
| 2 | Water Circ Heat w/ Pump | **Sansara** |
| 3 | Osteogenesis Bone Stimulator | **Sansara** |

On June 18, 2024, after a purported follow-up examination with Grant, Grant purportedly issued two separate prescriptions in the name of CS for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder support (Custom Fitted) - right | **Doleo** |
| 2 | Shoulder support (Custom Fitted) - right | **Doleo** |

On June 20, 2024, Grant purportedly issued a prescription in the name of CS, despite not examining or otherwise treating CS on that date, for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical Traction Frame w/ Pump | **Doleo** |

(xviii) On May 25, 2024, an Insured named NH was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic. After an initial examination with Entress on June 4, 2024, Entress purportedly issued a prescription in the name of NH for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board | **Sansara** |

|  | General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Shoulder support – right & left<br>Knee support - right & left<br>Elbow support - right & left<br>Hand support - right & left<br>Ankle support - right & left<br>Wrist support - right & left |  |

On July 18, 2024, after a purported follow-up examination with Muhammed Zakaria, M.D. ("Zakaria"), Zakaria purportedly issued three separate prescriptions in the name of NH for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Doleo** |
| 2 | Water Circ Heat w/ Pump | **Doleo** |
| 3 | Osteogenesis Bone Stimulator | **Doleo** |

On July 19, 2024, Zakaria purportedly issued two prescriptions in the name of NH, despite not examining or otherwise treating NH on that date, for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder support (Custom Fitted) - right | Non-Defendant DME supplier |
| 2 | Shoulder support (Custom Fitted) - right | Non-Defendant DME supplier |

On October 2, 2024, Sophia Staley, N.P. ("Staley") purportedly issued two prescriptions in the name of NH, despite not examining or otherwise treating NH on that date, for:

|  | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee support (Custom Fitted) - right | Non-Defendant DME supplier |
| 2 | Knee support (Custom Fitted) - left | Non-Defendant DME supplier |

(xix)   On June 14, 2024, an Insured named CB was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the

Ralph Ave. Clinic.  After an initial examination with Grant on June 18, 2024, Grant purportedly issued a prescription in the name of CB for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress<br>Bed board<br>General use cushion<br>Lumbar cushion<br>Lumbar sacral support<br>Positioning cushion<br>Thermophore<br>Car seat | **Doleo** |

On July 18, 2024, after a purported follow-up examination with Allana Herard, N.P. ("Herard"), Herard purportedly issued three separate prescriptions in the name of CB for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | **Doleo** |
| 2 | Water Circ Heat w/ Pump | **Doleo** |
| 3 | Osteogenesis Bone Stimulator | **Doleo** |

On August 29, 2024, Staley purportedly issued a prescription in the name of CB, despite not examining or otherwise treating CB on that date, for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Shoulder support (Custom Fitted) – left | **Doleo** |

(xx)    On June 29, 2024, an Insured named JF was purportedly involved in a motor vehicle accident and thereafter purportedly started treating at the Ralph Ave. Clinic.  After an initial examination with Zakaria on July 2, 2024, Zakaria purportedly issued a prescription in the name of JF for:

|   | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Cervical collar<br>Cervical pillow<br>Egg crate mattress | **Doleo** |

| | Bed board | |
|---|---|---|
| | General use cushion | |
| | Lumbar cushion | |
| | Lumbar sacral support | |
| | Positioning cushion | |
| | Car seat | |
| | Knee support - right | |

On August 8, 2024, after a purported follow-up examination with Staley, Staley purportedly issued three separate prescriptions in the name of JF for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | EMS Unit<br>Infra Red Lamp [sic]<br>Personal Massager | Non-Defendant DME supplier |
| 2 | Water Circ Heat w/ Pump | Non-Defendant DME supplier |
| 3 | Osteogenesis Bone Stimulator | Non-Defendant DME supplier |

On August 29, 2024, Staley purportedly issued two prescriptions in the name of JF, despite not examining or otherwise treating JF on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | LSO Trunk Support (Custom Fitted) | Non-Defendant DME supplier |
| 2 | Cervical Traction Frame w/ Pump | Non-Defendant DME supplier |

181. These are only representative samples.

182. In fact, virtually all the Insureds identified in Exhibits "1" – "6" were issued prescriptions for the same type of Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above and without regard for the medically necessity of such items.

183. In keeping with the fact that the prescriptions for Fraudulent Equipment provided to Defendants from the Ralph Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Ralph Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively

minor and low-impact motor vehicle accidents.

184.    In further keeping with the fact that the prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic were the result of a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment provided to patients at the Ralph Ave. Clinic were not isolated to the Insureds identified in Exhibits "1" – "6".

185.    For example, and in keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol, prescriptions for Fraudulent Equipment that are virtually identical to the prescriptions described above were issued to Insureds who treated at the Ralph Ave. Clinic and then provided to other DME/OD suppliers, including a company known as Urzum Medical Supplies, Inc. ("Urzum Supplies")

186.    GEICO previously sued Urzum Supplies and its purported owner in an action entitled Gov't Emps. Ins. Co., et al. v. Urzum Med. Supplies, Inc., et al., 1:24-cv-06580(EK)(PK) (E.D.N.Y. 2024), wherein GEICO alleged, like the allegations here against Defendants, that Urzum Supplies obtained prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic pursuant to unlawful financial arrangements and pursuant to a predetermined fraudulent prescribing and billing protocol.

187.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment were the result of a predetermined fraudulent protocol and not based upon prescriptions for medically necessary DME/OD, the prescriptions for Fraudulent Equipment that Defendants obtained from the Ralph Ave. Clinic are virtually the same as the prescriptions for Fraudulent Equipment that Urzum Supplies received from the Ralph Ave. Clinic.

188.    As demonstrated above, Insureds identified in Exhibits "1" – "6" were routinely prescribed Osteogenesis Bone Stimulators ("Osteo Stim Devices") by Referring Providers at the

Ralph Ave. Clinic.  Osteo Stim Devices are used to encourage bone growth and accelerate fracture healing.  CMS has published guidance making clear that the devices are medically necessary only in limited instances involving bone fractures.  In particular, CMS states as follows:

> A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:
>
> 1.  Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator; or
> 2.  Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery; or
> 3.  Congenital pseudarthrosis.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.
>
> A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See, https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

189.    In keeping with the fact that the Insureds who were prescribed Osteo Stim Devices had no reason to be prescribed an Osteo Stim Device, virtually none of the Insureds who received prescriptions for an Osteo Stim Device were diagnosed with a bone fracture.

190.    The prescriptions for Osteo Stim Devices were solely designed as part of the common scheme between Defendants, Secret Owner, Clinic Controllers, and Referring Providers to provide an opportunity for the DME Entities to charge GEICO $3,300.00 under HCPCS Code E0747 for purportedly delivering Osteo Sim Devices to Insureds.

191.    Furthermore, the contemporaneous dated initial examination or follow-up examination reports, virtually always failed to identify all of the Fraudulent Equipment purportedly prescribed to the Insureds, if the report even identified any of the Fraudulent Equipment at all.

192.     To the extent that the contemporaneous reports issued by Referring Providers at the Ralph Ave. Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would help the Insureds.

193.     Additionally, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment or medical efficacy of the Fraudulent Equipment, including the Insured's response to such equipment, and virtually never provided any indication whether to continue using any of the previously prescribed Fraudulent Equipment.

194.     In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

195.     However, the follow-up examination reports from the Referring Providers at the Ralph Ave. Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date, to the extent it was even mentioned at all.

196.     Additionally, as part of the fraudulent scheme between Defendants and unidentified third-party individuals, the prescriptions from the Ralph Ave. Clinic were never given to the Insureds but were routed directly to the DME Entities, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Ralph Ave. Clinic, without any interaction with or instruction

concerning their use from either Defendants or a healthcare provider.

197.    The prescriptions from the Ralph Ave. Clinic were also purposefully generic and vague to allow Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

198.    By way of example, many of the prescriptions do not specify a type of cervical collar or lumbar sacral support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the Ralph Ave. Clinic contained the phrases "Cervical collar" and "Lumbar Sacral Support", which provided Defendants with the ability to select a specific type of support that was more highly priced and profitable.

**F.    The Improper Distribution of Fraudulent Equipment to Insureds by Defendants Without Valid Prescriptions**

199.    As a threshold matter, for a prescription to be valid it must first actually be issued by a licensed healthcare provider who has determined that such a prescription is medically necessary.

200.    However, many of the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers from the Clinics were not valid prescriptions, as they routinely: (i) contained a photocopied signature of the Referring Provider; (ii) contained a signature stamp of the Referring Provider; or (iii) were not referenced or explained in any contemporaneous medical record.

201.    In addition, the DME Entities are not licensed medical professional corporations, and the Paper Owner Defendants are not licensed to prescribe DME or OD to Insureds. As such,

Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

202.    However, as part of the fraudulent scheme, in many of the fraudulent claims identified in Exhibits "1" – "6", Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME or OD to the Insureds.

203.    More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct Defendants to a unique type of DME and/or OD.

204.    While the prescriptions purportedly issued by the Referring Providers did not identify a specific type of medically necessary DME and/or OD for the Insureds, Defendants did not obtain any additional documentation from the Referring Providers approving or otherwise acknowledging that specific types of DME and/or OD – either by HCPCS Code or a detailed description – was medically necessary for the Insureds.

205.    These vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Fee Schedule.

206.    In addition, in many of the fraudulent claims identified in Exhibits "1" – "6",

Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because Defendants provided Fraudulent Equipment that was not identified on the prescription.

207.    In a legitimate clinical setting, when a DME/OD Supplier obtains a prescription that does not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier contacts the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

208.    As also part of a legitimate clinical setting, the DME/OD supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

209.    Upon information and belief, Defendants never contacted the referring healthcare provider to seek instruction and/or clarification but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, Defendants each elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Fee Schedule.

210.    As part of their common scheme, Defendants intentionally utilized the vague and generic prescriptions issued, or purportedly issued, by the Referring Providers to misrepresent the nature of the items actually prescribed and furthermore to misrepresent the items that the DME Entities purportedly dispensed so as to claim entitlement to a higher fee payable when submitting bills to GEICO.

211.    As a result, and as part of their common scheme, whenever the vague and generic

prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the DME Entities each chose to bill GEICO using virtually identical, specific HCPCS Codes thereby asserting that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

212.    For example, in many of the prescriptions issued to the DME Entities that are part of the claims identified in Exhibits "1" – "6", the prescriptions requested that the DME Entities provide such generic items as a "Lumbar Sacral Support" without any further specification.

213.    This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

> (i)      HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.
>
> (ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.
>
> (iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.
>
> (ix)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.
>
> (x)      HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.
>
> (xi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.
>
> (xii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient,

which has a maximum reimbursement rate of $806.64.

(xiii)   HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(xiv)   HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(xv)   HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xvi)   HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xvii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xviii)   HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xix)   HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xx)   HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xxi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xxii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xxiii)   HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xxiv) HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xxv) HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxvi) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxvii) HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxviii)HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

214. As unlicensed healthcare providers, the DME Entities and the Paper Owner Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for a "Lumbar Sacral Support".

215. Here, Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar sacral related Fraudulent Equipment and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

216. In response to such prescriptions, each of the DME Entities virtually always submitted a charge of $741.59 using HCPCS code L0650 pursuant to these generic prescriptions, which has one the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

217. Additionally, and as part of Defendants' common scheme and the control by the Secret Owner, virtually every time that each of the DME Entities received a prescription from the

Referring Providers for a "LSO Trunk Support (Custom Fitted)", Defendants billed GEICO using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

218.    Further, and as part of Defendants' common scheme and the control of the Secret Owner, each and every time that each of the DME Entities received a prescription from the Referring Providers for a "Knee support", Defendants chose to supply and bill GEICO using HCPCS Code L1830 or L1831 requesting a reimbursement of $208.13, despite the Fee Schedule containing 20 different types of knee orthoses.

219.    Similarly, and as part of the common scheme and control of the Secret Owner, each and every time that each of the ten DME Defendants received a prescription from the Referring Providers for a "Shoulder support", Defendants chose to supply and bill GEICO using HCPCS Code L3670 requesting a reimbursement of $111.07 or $251.34, despite the Fee Schedule containing eight different types of shoulder orthoses.

220.    As an additional example, each of the DME Entities received prescriptions for an "EMS Unit" but decided to instead provide Insureds and bill GEICO for TENS Units using HCPCS Code E0730.

221.    An EMS Unit performs an extremely different function from a TENS Unit, as an EMS Unit (**E**lectronic **M**uscle **S**timulation) is used to provide muscle stimulation to decrease muscle spasms or promote muscle growth, while a TENS Unit (**T**ranscutaneous **E**lectrical **N**erve **S**timulation) provides stimulation to the nerves to assist with pain management.

222.    These are only representative examples. To the extent that Defendants actually provided any Fraudulent Equipment, they improperly prescribed the Fraudulent Equipment for

virtually all of the claims identified in Exhibits "1" – "6" that are based upon vague and generic prescriptions because Defendants decided which specific items of DME and/or OD to provide the Insureds.

223.     In virtually all the claims identified in Exhibits "1"- "6" that were based upon vague and generic language contained in prescriptions issued by the Referring Providers, Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so or provided with clarification from the issuing healthcare provider. To the contrary, the Fraudulent Equipment was purportedly provided based upon Defendants' own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, were not entitled for reimbursement of PIP Benefits.

### G.     The Defendants' Common Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed

224.     As part of Defendants' common scheme and controlled by the Secret Owner, the bills submitted to GEICO and other New York automobile insurers by Defendants were also fraudulent in that they each made virtually identical misrepresentations in the DME and OD purportedly provided to the Insureds.

225.     In the bills and other documents submitted to GEICO, Defendants knowingly misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between Defendants and others who are not presently identifiable.

226.     In the bills and other documents submitted to GEICO, Defendants also

misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between Defendants and others who are presently unidentifiable.

227.    Further, Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

228.    Moreover, and as explained below, the bills submitted to GEICO by Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

229.    Thereafter, Defendants would submit multiple bills to GEICO for Fraudulent Equipment that was provided to Insureds on the same date in an attempt to conceal their scheme to fraudulently bill GEICO for Fraudulent Equipment purportedly provided to GEICO's Insureds by artificially lowering the amount of any one bill submitted to GEICO.

### 1.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

230.    As explained below, the bills submitted to GEICO by Defendants each misrepresented that the type of Fraudulent Equipment provided, to the extent any Fraudulent Equipment was provided, matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

231.    When Defendants submitted bills to GEICO and other New York automobile

insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

232.    As indicated above, the Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

233.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

234.    By submitting bills to GEICO containing specific HCPCS Codes, Defendants represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

235.    However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" – "6", when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

236.    As indicated above, it was part of the unlawful financial arrangements and predetermined protocols to allow the DME to maximize the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

237.    Accordingly, to the extent the prescriptions were actually authorized in the first place, the Clinic Controllers and Referring Providers purposefully provided prescriptions to Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

238.    Based upon the vague and generic prescriptions that Defendants received, Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

239.    As part of their common scheme, although several options were available to Defendants based upon the vague and generic prescriptions, Defendants often billed GEICO – and likely other New York automobile insurers – using HCPCS Codes that contained one of the higher reimbursement amounts, and did so for their financial benefit.

240.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

241.    For example, each of Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for "custom fitted" pieces when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

242.    As identified in the claims contained within Exhibits "1" – "6", Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for each Insured.  Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated" or "custom-fitted" for that individual patient.

243.    In order to help clarify the term "custom-fabricated", Palmetto defined a custom-fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on

clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient".  See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

244.    In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

245.    To help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

246.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification."  Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training.  For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics

(Braces) – Revised.

247.   By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements.  A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

248.   As shown in the claims identified within Exhibits "1" – "6", Defendants often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

249.   Based upon the prescriptions allegedly issued by the Referring Providers, Defendants each submitted numerous bills to GEICO for custom fabricated back braces under HCPCS Code L0632 which contained a charge for $1,150.00, custom fabricated shoulder orthoses using HCPCS Code L3674 which contained a charge for $896.92, and customized knee orthoses using HCPCS Code L1832 which contained a charge for $607.55.

250.   The products assigned to HCPCS Codes L0632, L3674, and L1832 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by Defendants.

251.    Instead, to the extent that Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for L0632, L3674, and L1832, the Fraudulent Equipment was provided without taking any action to custom-fabricate or fit the OD to the Insureds. To the extent that Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" – "6", Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

252.    In keeping with the fact that Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

253.    In addition to Defendants collectively submitting hundreds of charges for custom fabricated or custom fit OD, and as part of their common fraudulent scheme, each of Defendants in a virtually identical manner fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits

254.    The claims identified in Exhibits "1" - "6" for HCPCS Code E0184 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

255.    Each of the claims identified within Exhibits "1" - "6" for HCPCS Code E0184 contained a charge for $153.13 based upon prescriptions for an "Egg Crate Mattress".

256.    However, the product represented by HCPCS Code E0184 is defined as a dry pressure mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

257.    Despite billing GEICO – and other New York automobile insurers – using HCPCS

Code E0184, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item – were not dry pressure mattresses as required by HCPCS Code E0184.

258.    By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

259.    Unlike the fraudulent charges for $153.13 for each eggcrate mattress billed under HCPCS Code E0184 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

260.    In each of the claims identified within Exhibits "1" - "6" where Defendants billed for Fraudulent Equipment under HCPCS Code E0184, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0184.

261.    The claims identified in Exhibits "1" – "6" for HCPCS Code E2611 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

262.    Each of the claims identified within Exhibits "1" – "6" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for a "General Use Cushion".

263.    However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

264.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

265.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" – "6" who were provided with a cushion by Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair

266.    By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

267.    Unlike the fraudulent charges for $282.40 for each "General Use Cushion" billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

268.    In each of the claims identified within Exhibits "1" – "6" where Defendants billed for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2611.

269.    The claims identified in Exhibits "1" – "6" for HCPCS Code T5001 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly

provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

270.    Each of the claims identified within Exhibits "1" – "6" for HCPCS Code T5001 contained a charge of $405.00 based upon prescriptions for a "Car Seat".

271.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

272.    The following picture represents the type of car seat contemplated by HCPCS Code T5001:



273.    However, the orthopedic car seats purportedly provided by Defendants – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories", and having a maximum reimbursement

rate of $22.04 per unit.

274.    The claims identified in Exhibits "1" – "6" for HCPCS Code E0747 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

275.    Each of the claims identified within Exhibits "1" – "6" for HCPCS Code E0747 contained a charge for $3,300.00 based upon prescriptions for an "Osteogenesis stimulator".

276.    In reality, despite billing GEICO – and other New York automobile insurers – using HCPCS Code 0747, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for an Osteogenesis stimulator – did not comport with the requirements of E0747 and were cheap and poorly made items that were not reimbursable at $3,300.00 per unit.

277.    These are only representative examples. With the exception of the claims identified using HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibits "1" - "6", to the extent that any Fraudulent Equipment was actually provided, Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and were therefore not entitled to collect No-Fault Benefits in the first instance.

> **2.    The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

278.    When Defendants submitted bills to GEICO for Non-Fee Schedule items, Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

279.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are

reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

280.    By submitting bills to GEICO for Non-Fee Schedule items, Defendants each represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

281.    However, and as part of their common scheme and control by the Secret Owner, in virtually all of the charges to GEICO identified in Exhibits "1" - "6" for Non-Fee Schedule items, Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

282.    Instead, Defendants submitted bills to GEICO containing virtually identical charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

283.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

284.    When Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, Defendants' legitimate acquisition cost for the low-quality items were significantly less.

285.    In keeping with the fact that Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely

for their financial benefit, Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

286.    The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

287.    As part of their common scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" - "6" virtually always misrepresented the permissible reimbursement amount.

288.    For example, Defendants each billed GEICO for infrared heat lamps under HCPCS Code E0205 with a charge of $210.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

289.    GEICO was able to determine the exact model of infrared heat lamp Defendants provided to Insureds, which is available for purchase to the general public at internet retailers like VitalityMedical.com for $23.11, and available wholesale on Alibaba.com for just $10.00.

290.    Unlike the fraudulent charges for $210.00 submitted by Defendants under HCPCS Code E0205 for infrared heat lamps, the maximum reimbursement rate Defendants were entitled to receive was no more than $15.00 (150% of a $10.00 wholesale acquisition cost).

291.    The Defendants also each billed GEICO for personal massagers under HCPCS Code E1399 with a charge of $295.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

292.    GEICO was again able to determine the exact model of personal massager

Defendants provided to Insureds, which is available for purchase to the general public at internet retailers like Amazon.com for $20.95.

293.    Unlike the fraudulent charges for $295.00 submitted by Defendants under HCPCS Code E1399 for personal massagers, the maximum reimbursement rate Defendants were entitled to receive was no more than $20.95 (the price available to the general public on Amazon.com).

294.    The Defendants also each billed GEICO for whirlpools under HCPCS Code E1300 with a charge of $424.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

295.    GEICO was again able to determine the exact model of whirlpool Defendants provided to Insureds, which is available for purchase to the general public at internet retailers like ebay.com for $47.99, and available wholesale on MedMaxGlobal.com for $21.50.

296.    Unlike the fraudulent charges for $424.00 submitted by Defendants under HCPCS Code E1300 for whirlpools, the maximum reimbursement rate Defendants were entitled to receive was no more than $32.25 (150% of a $21.50 wholesale acquisition cost).

297.    The Defendants also each billed GEICO for bed boards under HCPCS Code E0273 with a charge of $101.85 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

298.    GEICO was again able to determine the exact model of bed board Defendants provided to Insureds, which is available for purchase wholesale on MedMaxGlobal.com for $3.50.

299.    Unlike the fraudulent charges for $101.85 submitted by Defendants under HCPCS Code E0273 for bed boards, the maximum reimbursement rate Defendants were entitled to receive was no more than $5.25 (150% of a $3.50 wholesale acquisition cost).

300.    These are only representative examples. In each of the claims identified within

Exhibits "1" – "6" for Non-Fee Schedule items, Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.

301.    These are only representative examples. In each of the claims identified within Exhibits "1" - "6" for Non-Fee Schedule items, each of Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.  The Defendants' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to GEICO and resulted in Defendants obtaining payment from GEICO under the New York "No-Fault" laws to which Defendants were never entitled.

### H.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

302.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of the DME Entities, seeking payment for the Fraudulent Equipment.

303.    The NF-3 forms, HCFA-1500 forms, and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their applications for a Dealer for Products License;

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly

misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were entitled to receive No-Fault Benefits.  In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with the Clinic Controllers; (b) prescriptions that were issued pursuant to pre-determined protocols designed to maximize charges without regard for the medical necessity of the items; and (c) decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items;

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly represented to GEICO that Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits.  In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms; and

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms.

## III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

304.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

305.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, Defendants have gone to great lengths to systematically conceal their fraud.

306.    Specifically, they knowingly misrepresented that they were lawfully licensed by the

City of New York as they never complied with regulations requiring the DME Entities to obtain a Dealer in Products License from the DCWP because the Paper Owner Defendants falsely indicated in the application for a Dealer in Products License, under penalty for false statements, the premises addresses for the DME Entities and hid the ownership interests of the Secret Owner to induce the DCWP to issue a Dealer in Products License, and concealed these misrepresentation in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

307.    The Defendants also knowingly misrepresented and concealed facts related to the unlawful financial arrangements with the Clinic Controllers and others that formed the basis for the prescriptions for Fraudulent Equipment that were provided to Defendants and ultimately used as the basis to submit bills to GEICO, in order to prevent GEICO from discovering that Defendants unlawfully exchanged kickbacks for patient referrals and that the Fraudulent Equipment was billed to GEICO to maximize financial gain without regard to genuine patient care.

308.    Additionally, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

309.    Furthermore, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

310.    In addition, Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

311.    Finally, Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

312.    The Defendants operated their fraudulent scheme in a "quick hit" fashion designed to frustrate GEICO's efforts to identify fraud, shifting the billing from one DME Entity to the next over the course of just eight months. The billing and supporting documentation submitted by Defendants, when viewed in isolation, did not reveal its fraudulent nature.

313.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers.  The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection

proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

314.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that DME Defendants have been engaged in widespread fraud.

315.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2.2 million based upon the fraudulent charges representing payments made by GEICO to Defendants.

316.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

317.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

318.    There is an actual case in controversy between GEICO and each of the DME Entities regarding more than $840,000.00 in fraudulent pending billing that has been submitted to GEICO in the names of the DME Entities.

319.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the remaining Entities Providers falsified their business address and concealed

the ownership interests of the Secret Owner on their applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

320.    The DME Entities also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

321.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants and others who are not presently known, rather than to treat the Insureds.

322.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the DME Entities purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon legitimate prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

323.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

324.    The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented that the charges for Non-Fee Schedule items contained

within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

325.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

326.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

327.    Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

328.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

329.    The DME Provider Enterprise operated under six separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other

New York automobile insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

330.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

331.    The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

332.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not entitled to receive under the No-Fault Laws, because: (i) in every claim, that the DME Entities had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of

the DME Entities were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was instead provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

333.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of

mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Entities, inasmuch as the DME Entities never operated as legitimate DME/OD providers, never were entitled to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Entities to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Entities to the present day.

334.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2.2 million pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

335.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

### THIRD CAUSE OF ACTION
### Against the Paper Owner Defendants and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

336.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

337.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

338.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or

associated with the DME Providers Enterprise.

339.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Entities were not entitled to receive under the No-Fault Laws because: (i) in every claim, that the DME Entities had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Entities were lawfully licensed as they knowingly falsified information on their applications for a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was instead provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims,

to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

340.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

341.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2.2 million pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

342.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Dashevsky, Yungi Supply, and John Doe Defendant "1"
### (Common Law Fraud)

343.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

344.    Yungi Supply, Dashevsky, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

345.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) the representation that Yungi Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Yungi Supply was not lawfully licensed as Dashevsky knowingly falsified the business address and ownership information for Yungi Supply on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements;  (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

346. Yungi Supply, Dashevsky, and John Doe Defendant "1" intentionally made the

above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Yungi that were not compensable under New York no-fault insurance laws.

347.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $275,000.00 pursuant to the fraudulent bills submitted by Yungi Supply, Dashevsky, and John Doe Defendant "1".

348.    Yungi Supply, Dashevsky, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

349.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Dashevsky, Yungi Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

350.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

351.    As set forth above, Yungi Supply, Dashevsky, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

352.    When GEICO paid the bills and charges submitted by or on behalf of Yungi Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Yungi Supply, Dashevsky, and John Doe Defendant "1".

353.   Yungi Supply, Dashevsky, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Yungi Supply, Dashevsky, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

354.   Retention of GEICO's payments by Yungi Supply, Dashevsky, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

355.   By reason of the above, Yungi Supply, Dashevsky, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $275,000.00.

## SIXTH CAUSE OF ACTION
### Against Drubetskaya, Shemesh, and John Doe Defendant "1"
### (Common Law Fraud)

356.   GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

357.   Shemesh, Drubetskaya, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

358.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Shemesh had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Shemesh was not lawfully licensed as Drubetskaya knowingly falsified the business address and ownership information for Shemesh on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact

the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

359.    Shemesh, Drubetskaya, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Shemesh that were not compensable under New York no-fault insurance laws.

360.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $208,000.00 pursuant to the fraudulent bills submitted by Shemesh, Drubetskaya, and John Doe Defendant "1".

361.     Shemesh, Drubetskaya, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

362.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Drubetskaya, Shemesh, and John Doe Defendant "1"**
**(Unjust Enrichment)**

363.     GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

364.     As set forth above, Shemesh, Drubetskaya, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

365.     When GEICO paid the bills and charges submitted by or on behalf of Shemesh for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Shemesh, Drubetskaya, and John Doe Defendant "1".

366.     Shemesh, Drubetskaya, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Shemesh, Drubetskaya, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

367.     Retention of GEICO's payments by Shemesh, Drubetskaya, and John Doe

Defendant "1" violates fundamental principles of justice, equity, and good conscience.

368.    By reason of the above, Shemesh, Drubetskaya, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $208,000.00.

## EIGHTH CAUSE OF ACTION
### Against Jakobia, Simcha Supply, and John Doe Defendant "1"
### (Common Law Fraud)

369.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

370.    Simcha Supply, Jakobia, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

371.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Simcha Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Simcha Supply was not lawfully licensed as Jakobia knowingly falsified the business address and ownership information for Simcha Supply on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements;  (iv) the

representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

372.    Simcha Supply, Jakobia, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Simcha Supply that were not compensable under New York no-fault insurance laws.

373.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $388,000.00 pursuant to the fraudulent bills submitted by Simcha Supply, Jakobia, and John Doe Defendant "1".

374.    Simcha Supply, Jakobia, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

375.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Jakobia, Simcha Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

376.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

377.    As set forth above, Simcha Supply, Jakobia, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

378.    When GEICO paid the bills and charges submitted by or on behalf of Simcha Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Simcha Supply, Jakobia, and John Doe Defendant "1".

379.    Simcha Supply, Jakobia, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Simcha Supply, Jakobia, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

380.    Retention of GEICO's payments by Simcha Supply, Jakobia, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

381.    By reason of the above, Simcha Supply, Jakobia, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $388,000.00.

## TENTH CAUSE OF ACTION
### Against Solovyov, Olyam Supply, and John Doe Defendant "1"
### (Common Law Fraud)

382.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

383.    Olyam Supply, Solovyov, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

384.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Olyam Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Olyam Supply was not lawfully licensed as Solovyov knowingly falsified the business address and ownership information for Olyam Supply on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements;  (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills

submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

385.    Olyam Supply, Solovyov, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Olyam Supply that were not compensable under New York no-fault insurance laws.

386.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $498,000.00 pursuant to the fraudulent bills submitted by Olyam Supply, Solovyov, and John Doe Defendant "1".

387.    Olyam Supply, Solovyov, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

388.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Solovyov, Olyam Supply, and John Doe Defendant "1"
### (Unjust Enrichment)

389.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

390.    As set forth above, Olyam Supply, Solovyov, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

391.    When GEICO paid the bills and charges submitted by or on behalf of Olyam Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Olyam Supply, Solovyov, and John Doe Defendant "1".

392.    Olyam Supply, Solovyov, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Olyam Supply, Solovyov, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

393.    Retention of GEICO's payments by Olyam Supply, Solovyov, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

394.    By reason of the above, Olyam Supply, Solovyov, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $498,000.00.

## TWELFTH CAUSE OF ACTION
### Against Melnichuk, Sansara, and John Doe Defendant "1"
### (Common Law Fraud)

395.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

396.    Sansara, Melnichuk, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

397.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Sansara had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Sansara was not lawfully licensed as Melnichuk knowingly falsified the business address and ownership information for Sansara on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these

amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

398.    Sansara, Melnichuk, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sansara that were not compensable under New York no-fault insurance laws.

399.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted by Sansara, Melnichuk, and John Doe Defendant "1".

400.    Sansara, Melnichuk, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

401.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Melnichuk, Sansara, and John Doe Defendant "1"**
**(Unjust Enrichment)**

402.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

403.    As set forth above, Sansara, Melnichuk, and John Doe Defendant "1" have engaged

in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

404.    When GEICO paid the bills and charges submitted by or on behalf of Sansara for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Sansara, Melnichuk, and John Doe Defendant "1".

405.    Sansara, Melnichuk, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Sansara, Melnichuk, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

406.    Retention of GEICO's payments by Sansara, Melnichuk, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

407.    By reason of the above, Sansara, Melnichuk, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $500,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Cataraso, Doleo, and John Doe Defendant "1"
### (Common Law Fraud)

408.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

409.    Doleo, Cataraso, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

410.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) the representation that Doleo had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Doleo was not lawfully licensed as Cataraso knowingly falsified the business address and ownership information for Doleo on their application for a Dealer in Products license; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were forged and/or duplicated and the Fraudulent Equipment was provided pursuant to unlawful financial arrangements; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was actually provided; and (vi) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

411.    Doleo, Cataraso, and John Doe Defendant "1" intentionally made the above-

described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Doleo that were not compensable under New York no-fault insurance laws.

412.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $396,000.00 pursuant to the fraudulent bills submitted by Doleo, Cataraso, and John Doe Defendant "1".

413.    Doleo, Cataraso, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

414.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Cataraso, Doleo, and John Doe Defendant "1"
### (Unjust Enrichment)

415.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

416.    As set forth above, Doleo, Cataraso, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

417.    When GEICO paid the bills and charges submitted by or on behalf of Doleo for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Doleo, Cataraso, and John Doe Defendant "1".

418.    Doleo, Cataraso, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Doleo, Cataraso, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

419.    Retention of GEICO's payments by Doleo, Cataraso, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

420.    By reason of the above, Doleo, Cataraso, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $396,000.00.

## JURY DEMAND

421.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgement be entered in their favor and against Defendants as follows:

A.    On the First Cause of Action against Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that against Yungi Supply, Shemesh, Simcha Supply, Olyam Supply, Sansara, and Doleo have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $2.2 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Paper Owner Defendants and the John Doe

Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $2.2 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Yungi Supply, Dashevsky, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $275,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Yungi Supply, Dashevsky, and John Doe Defendant "1" for more than $275,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Shemesh, Drubetskaya, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $208,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Shemesh, Drubetskaya, and John Doe Defendant "1" for more than $208,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Simcha Supply, Jakobia, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $388,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.     On the Ninth Cause of Action against Simcha Supply, Jakobia, and John Doe Defendant "1" for more than $388,000.00 in compensatory damages, plus costs and interest and such

other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Olyam Supply, Solovyov, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $498,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Olyam Supply, Solovyov, and John Doe Defendant "1" for more than $498,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Sansara, Melnichuk, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Sansara, Melnichuk, and John Doe Defendant "1" for more than $500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Doleo, Cataraso, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $396,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

O.      On the Fifteenth Cause of Action against Doleo, Cataraso, and John Doe Defendant "1" for more than $396,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: April 10, 2025
      Uniondale, New York

RIVKIN RADLER LLP

By:  _/s/ Barry I. Levy_           

      Barry I. Levy, Esq.
      Michael Vanunu, Esq.
      Philip P. Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4885-8215-2439, v. 2